Good afternoon, everybody. So our first case is 24-2638, Ali Razak, is that correct? Razak and counsel, your last name is Liz Reardon, is that correct? Reardon. Reardon. Good afternoon. The old Irish way. Good afternoon. Thank you, your honors. May it please the court. I'm Shannon Liz Reardon. For plaintiffs with me is Jeremiah Bay. I'd like to reserve five minutes, if I may, for rebuttal. Sure. So, your honors, just to give you a little roadmap of what I'm going to be talking about, I want to explain to you, first of all, the four reasons that the decision below can be reversed. First of all, before anything else, we urge that this court certify this case to the Pennsylvania Supreme Court. Why don't you spend most of your time on the first part of where you're going, because we can discuss it. I think Stuber kind of gives me pause anyhow in terms of certifying it. No. So, there are several reasons why Stuber is not- Well, I'm not surprised. I think what Judge McKee is saying is that we've already thought about certification, so you should spend your time on the other issues. I see. Okay. So, you don't want me to explain why Stuber is not good law anymore. Oh, I'm so sorry. I turned my phone off. I thought- I'm sorry. So, you're saying you don't want me to explain why Stuber is not- It's a productive use of your time. Especially since you've reserved five minutes. Okay. The certification issue, I don't think, is something we'll take on the briefs. Okay. All right. Thank you. Okay. So, moving on to the other issues, first of all, the burden of proof here. The district court erred in the burden of proof. The district court erred in dismissing this case based on a finding of futility. And if Rule 50 should have been considered, it should have been the plaintiffs who won, not Uber. So, let me start- Burden of proof. What's your best authority for the fact that the plaintiffs don't have to prove that they are employees? Well, first of all, Stuber, under Pennsylvania law, Stuber said there's a presumption of employment, and thus the employer has the burden of proving that- For Pennsylvania. Under what case? Under Stuber. I can cite that to you. That was not under this statute, was it? If you're going to look to Stuber for anything, Stuber said that there's a presumption of employment and that it is for the employer to show that there is not an employment relationship. Uber argues- For the PMWA, right? It's not for the FLSA. It's pretty clear that- Right, right, right. Under the FLSA.  And also, notably, Stuber did not address the WPCL at all. Stuber only addressed the PMWA. We have two Pennsylvania statutes here. So- That's not controlling here. Uber says that Stuber is dicta on the point that the burden is on the employer, but if that's dicta, then so is the decision to apply the federal economic realities test as well, because both of those were agreed to by the parties and weren't disputed. So really, they're both dicta. So either they're both dicta, in which case the court really does need to certify this to the Pennsylvania Supreme Court, or if they're not dicta, then they're both binding. And if Stuber is binding, then it is binding on the point that the burden of proof should have been on Uber to show that the workers were not employees. That's the Pennsylvania law argument. The federal law argument we have is that the argument that the workers don't need to have minimum wage protections and overtime protections under the FLSA is a defense to the FLSA. So Uber is seeking an exemption from the FLSA based on its argument that the drivers are independent contractors. The U.S. Supreme Court said in the Idaho mill workers case, I'm sorry, it's an Idaho case, Idaho cheese mill workers case. I'm surprised you're not addressing the two bases on which the court dismissed this case with prejudice. Number one, it's inherent authority, and number two, 50B. That's what we really have before us, isn't it? Well, those are my points three and four. Okay. So I will come to that. I think they should have been one and two, but go ahead. Okay. But on the burden of proof, again, I think Stuber is dispositive. It's dispositive for anything. And under the federal law, this is a very important point, is that this is an exemption. And under Idaho steel workers case, the U.S. Supreme Court said that the burden is on an employer to prove a defense to the FLSA. Very important issue. And we know that the burden of proof is important here because we had two hung juries that were completely confused about the standard that they were asked to apply. And the burden of proof is obviously very important here. So I can move on to the futility issue. The reasons why, I mean, the district court- Well, it's really inherent authority. The court exercised its inherent authority. And I guess we'd like to hear from you as to what are the bounds of that inherent authority. Does this fit within that concept? Yes. This is unprecedented for a district court to dismiss a case based on its determination that it was futile, that the plaintiffs wouldn't win. The prior case law has allowed dismissal under the inherent authority if the plaintiff's claims are frivolous, if there's a lack of diligent prosecution, if there is a failure to comply with court orders. What do you make of the district court's reasoning that the plaintiffs have presented the same case twice and they didn't prove their case, so a third time is just folly? Well, so you cannot read anything from a hung jury. The U.S. Supreme Court said that in the Yeager case. So it's not a- Uber didn't win either trial either. And you can't say that no reasonable juror could possibly find for the plaintiffs. When we won jurors in both trials, jurors- That's more a 50-B argument. But this is not- there aren't that many cases like this. I mean, the only case we really have is our own Wright case, which, of course, was a criminal case, which is very different. How much of the court's time are you allowed to take up? This case was brought in 2016. Two hung juries. If there's another hung jury, how- when can the court say, listen, I spent enough time on this. You're not telling me you're going to do anything different. You know, if you did, maybe I'd see that I would spend more time on it. But right now, I don't see any future. I'm exercising my inherent authority to dismiss it. You know, I have to move on to other cases. I have several responses to that. First of all, it's very common these days in the federal courts that we see mass torts, in which a court's time can be taken up by trial after trial after trial. And I've never heard of a rule that a case can be dismissed just because it will take too long. I recently litigated a case in federal court in New York called Kneeby v. Dows, where the court certified the case as a class action for liability purposes, 20,000 New York taxi drivers, but determined that there would need to be an individualized showing for each one to prove damages. And the court said, OK, let's get started with the trials. Well, of course, that's individualized damages for different plaintiffs. We have the same plaintiff, the same defendant, the same evidence.  When? When does it end, if you will? Well, again, Uber did not win. Under Yeager, you can't read anything into this because we had one jurors. How many attempts are you entitled to? Well, let's just say that Wright helps us. No, no, answer the question. How many attempts are you entitled to before a judge says enough is enough? More than two. How many? More than two. I'm not great at math, but I'm guessing more than two is not a very specific answer to a question that says how many. Right. I'm just saying the court at this point does not need to decide. I don't know, five, ten. It's not before this court to decide how many. But what happens if it goes back and another hung jury comes along? And then it goes back again, another hung jury. At what point is it actually futile? That really just all goes to show why we need a clearer standard here. It goes to show why you can't answer the question and why the judge was so frustrated. At what point does it become futile? If we have multiple juries in which no juror, well, I guess we would have lost if that were the case. We won some jurors. Some jurors were persuaded that plaintiffs were right. At what point does it become futile? You can't win all of the jurors. I'm sorry, Your Honor. I can't answer that question because it's not before us. If there were five trials, maybe it would be a different story. There's obviously no cut and dry answer here. We have to consider the ramifications of whatever we decide here. And one of those ramifications is going to be looking down the road as a policy matter. What do we say to the district court? Do you ever have the right or the ability or the power to just say, look, this case is taking my entire docket. I can't try it again. It's worthless to try it again. I'm just going to dismiss it. It's another reason why the burden of proof is so important here because. Looking for a quantity, a number. Again, I don't know, five, ten, pick a number, but it's not two. You would agree that the court at some point does have that authority? Again, I don't think that question is before you. He just pointed to you. I don't have an answer for that. In the Knebe case that I tried in New York. Let me try this one more time. Do you think the court at some point, whether it be two or 20, do you think the court at some point can say this is futile? I'm not going to let him try again. I don't know the answer to that. You already said five or ten. I said, I questioned it. I said, I don't know, five, ten, that's for this court to decide perhaps. That's why we gave the oral argument. Right, right. I mean, it was on my football essay preparing for this thing. We're asking for help. At what point? I'm sorry, Your Honors. It would be for you to decide if you decided that. But I just want to say that under Wright, this court reversed a district court saying that a prosecutor could not go forward with a third trial. Now, Judge Rendell said, well, that was criminal, so that was different. But wouldn't that actually help us? In the criminal context, you have due process concerns. And here, there, the court said that the prosecutor could go forward a third time. And given the fact that it's a criminal context and this is the civil context, why would there be less protection for a criminal defendant than a civil defendant? It's not protection for the defendant. It's more the government from the standpoint of, and I think from a public policy standpoint. You know, if they think this person should be behind bars, prosecutorial discretion, they have a right. Here we have a civil case. It's about money. Right. The Wright case cited Dietz, which was a civil case. All right. Can I ask you a question? How much money is at stake here? How big is the class? I have no idea of. There are likely hundreds of class members here. But by agreement, the parties tried the issue for the three plaintiffs first, whether they were employees or independent contractors. But for an individual, do you know the dollars amounts here? Thousands of dollars. Thousands of dollars. All right. I see that my red light is on. Let's hear you on 50B. I'm sorry? You want to cede some of your time so you can talk about 50B? Well, I can answer it now. Give us your 50B. Okay. So on 50B, so this court said in the Verma case, the question of whether a worker is an employee or an independent contractor is a mixed question of fact and law. So on the really undisputed facts below, actually, let me back up for a minute. In the Lowman case, the Pennsylvania Supreme Court determined an Uber driver to be an employee for unemployment purposes. It really makes little sense that an Uber driver is an employee for unemployment but not for wage purposes. Are you addressing 50B? Yes. If you would talk about Judge Baleson's reasoning under 50B. He said that the evidence in the second trial was different because all the PPA rules and regulations were the focus. And when that's the reason that Uber adopts them, they're not considered in the control factor. Okay. Well, that was wrong both legally and factually. So first let me talk about legally. Legally, many courts, including the 11th Circuit and Scantlin v. Knight Enterprises, said that the fact that a company needs to have rules in order to comply with regulation is not a defense to the control factor. Many courts have said that. The Department of Labor cited that in their withdrawn brief, but those cases are still on Westlaw, of course. And in the first trial, Judge Baleson got it right and gave us a jury instruction based on Scantlin. In the second trial, he read the case law differently and did a 180 flip and said that if there are rules that are to comply with regulations, they are not indicative of control. But he misapplied the DOL regulation that had just been enacted, which said that if the rules go beyond the regulation, that is evidence of control. And there's just no doubt he was factually wrong in saying that the rules that Uber put in place don't go beyond the PPA standards. If you look at pages 34 and 36 of our brief. Can you tell me the rules that you think control the manner of work by the driver that is not a PPA regulation? Okay, so first of all, Uber monitored drivers at all times, which the PPA didn't do. Uber said that the drivers could not solicit or accept rides off of the Uber platform, which the PPA didn't do. And of course, this is a very important point for employee versus independent contractor status, whether you can have your own business. Uber said that you can't delegate the rides to somebody else. Also very important for the independent contractor consideration. Uber had a minimum rating. It had a passenger rating system, so it could control the drivers by requiring that the drivers keep a near perfect score on the passenger rating system, also not required by the PPA. But that's not controlling the manner in which the... I mean, the whole idea is if you're an employer, you can control the manner in which the work is performed. So I don't see the idea that they have to have a perfect rating that controls the manner. Judge Rendell, if you look at pages 34 to 36 of our brief, you'll also see that Uber's rules tell the drivers don't talk too much, don't talk too little. That's not in the PPA regulations. The rules say you can't accept tips. The rules say that if you can't... What? I'm sorry. Tips. Tips. You can't accept tips. The Uber rules say that if you don't accept enough rides, you can be terminated. The PPA rules don't say that. The Uber rules say you can't disparage Uber. And most importantly, Uber, under its rules, has the right to terminate the drivers at will, which many courts have recognized as the ultimate form of control. Because if you know that your boss can terminate you for any reason, you're going to do whatever you think your boss wants you to do. The district court erred in saying that the ability to terminate sounds like an independent contractor relationship, when multiple courts have recognized that that is the strongest form of control, the ability to terminate at will. What's your best case on that for that proposition, that termination is controlling the manner of work? There are many cases. I just don't have them off the top of my head. Maybe in rebuttal. Okay, I'll say that at rebuttal. But also, one of the trial exhibits we had was Uber's Philly driver playbook, in which it said the following. Uber's quality control system regularly engaged drivers who needed encouragement or training, and either encouraged them to approve or managed them out of the fleet. That is control. That is well beyond anything the PPA ever reported to the community. But what we're doing now, there are six elements to the test. Yes. And we could, like these juries, be here indefinitely if we go through all of the law, even most of the law, each of the six factors. It's a balancing test. So even if you went on control, there are five other ones. I'm not sure this is very productive. I could just run through them very quickly. Control should have gone in our favor, but in any event, we should win on all of the others as a matter of law. On the integral issue, the district court previously held that drivers are an essential part of Uber's business as a transportation company. It actually said it was beyond dispute that if Uber could not find drivers, Uber would not be able to function. We had a trial exhibit that quoted Uber, saying drivers are at the center of the Uber experience. But then later, after the second trial, the district court flip-flopped and said the record was mixed on whether Uber is a technology company or a transportation business. Well, that's a very, very different question. Very different question. Whether it's technology or transportation has nothing to do with the centrality of drivers. To me, that's a ridiculous question. And Uber admitted in an exhibit that we put on at trial that drivers are at the center of the Uber experience. That was directly from Uber. It's undisputed that these three plaintiffs worked for Uber for years, usually more than 40 hours a week. Uber's manager testified at trial, Tara Murray, that it was the driver's full-time job to drive for Uber. On the special skill issue, this court previously said that driving is not a special skill. It's therefore law of the case. Courts have regularly held that driving is not a special skill. Look at Alexander v. FedEx. And the court came up with some argument that we claimed that driving a black car was somehow more of a special skill than driving UberX. We never said that. There was never any evidence about that. And this court in the Verma case said that creating a fantasy, a luxury experience for strippers is not a special skill. On the investment factor, this court said in Verma that what matters is the relative investment. And here, yes, the drivers had to pay for their cars and their phones. Uber put billions of dollars into its system so that this transportation system— Which is why you could argue it's a technology company, because they put it into technology. Well, it calls itself a transportation company, except in court. On the opportunity for profit and loss based on managerial skill, the last factor, the drivers had none. They could make more money by driving more, as the manager, Tara Murray, testified. You're really arguing to the jury. These weren't the basis for Judge Bailson to make the ruling. So we're— No, in his ruling, alternative to the futility basis for dismissal, he said that he was going to grant Uber's Rule 50 motion. Right, but it was 50B, mainly because of these PPA rules. He took those out of the equation as control. So, really, he was deciding on control. These other factors really weren't part of his decision. They were something the jury would consider. Right, but if we went on all the other factors, I'd say even a balancing test means that we should have won. And he was wrong legally and factually. It sounds like you want us to rule in your favor. You just want a new trial, right? Well, alternatively. I mean, alternatively to a new trial, I mean, first, we want you to certify the Pennsylvania issue to the Supreme Court. Second, we want you to either give us a new trial or recognize that under the law, we should have won the case. Oh, wow. All right. We understand your audience. Thank you. We'll see you on rebuttal. Thank you, Your Honor. Good afternoon, Mr. Pritchard. Good afternoon. May it please the Court. My name is Rob Pritchard with Christian Angadi, representing Applebee's Uber Technologies, Inc. and Gagin, LLC. Appellants twice failed to convince a jury that they met their burden to prove that they were Uber's employees. Appellants even conceded that their failure in the second trial was, in their words, foreseeable. The district court, who had presided over this matter for nearly 10 years and through both trials, properly concluded in the exercise of its discretion that a third trial would be futile. But didn't we say in Wright that futility is not a – that prediction of what's going to happen is not a proper basis? I mean, we basically said that in Wright. Aren't we bound by that? The Court really used an improper standard of futility. Not at all. Wright is very supportive of our position in this appeal. In the Wright case, which, first of all, was a criminal matter, as you pointed out earlier, that case implicated separation of powers considerations. So in that case, the district court, after two hung juries, dismissed the indictment. And on appeal, this court, in a one-to-one-to-one decision, held that it reversed and sent it back for a third trial. But let me quote to you from Wright. It said it was improper for the district court to apply its own predictions about what another jury may do when presented with the same evidence. In a criminal case where separation of powers was the primary consideration, if you look at Judge Schwartz's leading opinion in that case, it was about separation of powers and the right of the executive branch to decide when enough was enough. But how does that displace its statement that it's improper to predict? In that context, because Judge Schwartz also said in a footnote that the district court did have an ability to dismiss, and this is a quote, quote, dismiss a civil case as part of a court's inherent power to manage its own affairs, quoting a link Supreme Court decision from earlier. So in that criminal case, Judge Schwartz said because of separation of powers concerns, only willful or prosecutorial misconduct was the basis for dismissing an indictment. Judge Nygaard dissented, saying that this was totally within the district court's inherent authority to do this and would have affirmed the judgment dismissing the indictment after two hung juries. And Judge McKee agreed with Judge Nygaard that a district court can step in at some point and bar a retrial. So two of the three judges on that panel would have held that it was okay to do. In a civil case, even Judge Schwartz would have recognized the authority of a district court to dismiss an action. I think Judge McKee, and he can correct me if I'm wrong, said three, maybe after three trials. He didn't say two. Judge McKee said on this record. There's also a concern. Basically, I said, look, the Supreme Court is going to reverse this. Basically, that's what that says. We're going to get reversed by the Supreme Court. There's no way in the world the Supreme Court is going to buy our dismissing the indictment at this point, perhaps after the third trial. And even your opinion, when it's a great detail on the concern around separation of powers, which simply does not exist in this particular civil dispute over money between two civil litigants. But what inherent authority case can you cite? I mean, usually the plaintiff has done something wrong. There's something where the equities just don't fit. And the court can say, listen, you know, I'm going to dismiss it. But this doesn't fit with any precedent regarding inherent authority. There's also no precedent in which this argument was rejected. This is essentially a case of first impression for Judge Billson and now for this court. All right, so as a case of first impression, we send it back. What factors should we tell district court judges they need to consider before they can say this is futile? Absolutely. So I think, Ben, even appellants concede that this issue, this court's standard of review on this particular issue is abuse of discretion. So this I submit as a two-step inquiry for the court. The first question is, does the authority exist? Yes or no? Legal question. And I think even Wright, in a civil context, would support the idea that the right exists. In Levy-Craig, Judge Rendell, you were on that panel that recognized the district court's inherent authority to manage its docket, including dismissal, so long as the court also first considers less drastic measures before that. Now, that wasn't a three strikes and you're out. Let's assume the court has that authority. What factors do we tell district courts to consider? Well, the first thing is, for sure, there is no magic number. And with regard to your colloquy with Ms. Liz Reardon about the magic number, we submit there can be no magic number. Rather, the question should be that the district court legally has the authority to do this and the exercise of its authority to manage its docket, and the question should be whether the district court has any reason to believe that yet another jury trial would yield a different result compared to the prior trials. And in this particular case, on this record, Judge Bailson acted wholly within his discretion to realize that a third trial was not going to yield a different outcome. That the court can exercise its discretion when it believes that it will not yield a different outcome. Where do you get that principle in inherent authority? Well, Green v. Concord Baptist was a First Circuit decision saying that dismissal was appropriate where it is, in that court's words, crystal clear that the plaintiff cannot prevail. That's just one example. Well, it isn't crystal clear. What's that? It's not crystal clear. It was to Judge Bailson who sat through the case for 10 years. In terms of the jurors, you had 12 juries. Two jurors in the first trial who felt differently, who thought they could prevail. The question ultimately for the plaintiffs is whether they can ever hope to persuade a unanimous jury to agree that they have met their burden of proof. And Judge Bailson sat through both trials. He saw that they did not do that either time. The jury was given lots of opportunities to ask questions, to answer special interrogatories, to sort of flesh out their issues. Appellants conceded that the jury trial hung jury in the second case was foreseeable. Not surprising because they presented, as Judge Bailson observed, virtually the same exact case in the second trial as in the first, with the same witnesses providing the same testimony and using the same exhibits. Appellants have failed both in front of Judge Bailson and on appeal to explain what they might hope to do differently in a third trial. And, in fact, appellants are now tethered to yet another trial transcript of their testimony. So appellants' testimony, if granted a third trial, can't deviate from their testimony in the first two trials. Maybe the jury will view credibility differently. Maybe the jury will view the witnesses differently, maybe from a credibility standpoint, or maybe counsel's arguments will be more forceful. You just don't know. This brings us back, though, to the court's exercise of its inherent authority and the burden faced on the district courts in the Eastern District with regard to the inherent ability to manage their dockets. With more than 8,500 civil cases now pending in the Eastern District, in addition to an overwhelming criminal docket, it is unfair to other litigants, to witnesses, to the jurors, to the judiciary as a whole, and it's certainly unfair to a civil defendant who has now been defending this case for nearly 10 years to be told that they have to go sit through another trial just so that plaintiffs can take another chance. With the same evidence that they used in the first two trials. It is a complete waste of time, and the person in the best position to recognize that fact is the district judge who has supervised this case for 10 years. Well, it strikes me that part of the core problem here may be the underlying test. The Dallas, America case is so different than this situation. We're talking about a situation where we have a test from Dallas, America that gives us six factors that have to be balanced. Twelve people have to balance those factors. So you're basically giving the jury a Rubik's cube to solve, and I think the jury, the judge also has to win the Jiang-King test, which is 10 factors or 12 factors. How do you get 12 people to balance 22 factors and all agree on how they should balance? That seems to me impossible. It may just be that the body of law that we're looking at should not be applied beyond the context of Dallas, America. Well, Your Honor, with regard to the weighing of the factors, each juror theoretically could have weighed the factors their own way. The ultimate question that was asked of the jury was, did plaintiffs prove by a preponderance of the evidence that they should have been classified as Uber's employees? It might be that one juror was persuaded on the control factor, another juror was persuaded by two or three other factors. As long as on the ultimate question, they could reach agreement. The ultimate question is comprised of how they did the individual balancing on those six factors. It's really like a tiered inquiry. The first inquiry are the historical facts. Red light, green light. What did the testimony show were the facts of the case? And on that, there really are no totally historical facts. The facts are not really at issue. Maybe there's a way to decide this, to balance it as a matter of law. Now, we said in Dallas, America, it's a mixed question, and all the law says it's a mixed question, but this thing only becomes manageable if you look at the balancing in terms of it being a matter of law, applying facts to the six factors in Dallas, America, and making a legal conclusion as to how that balances out. Well, in the prior panel in Resort One, the first appeal in this case held that that was something that would have to go to the jury, and so it did. That's the problem. The Uber One summary judgment below, on appeal, this court said that this needed to go back for the fact finder. This court, in its decision, said that there were two paths forward. Path one would be submitted to the jury. Path two would be to consider a Rule 52 proceeding. Now, of course, a Rule 52 proceeding requires the consent of the parties in a civil matter where a side demanded a right to a jury trial, and that was not stipulated to abandon. So in this particular case, Rule 52 is not a valid consideration for the court, and it goes to the jury. It went to the jury. Would it be a fair question on remand, if it were to go back, for the district court to say, okay, plain and just, either waive your right to a jury trial under Rule 52B or dismiss it for futility? Would that be a fair question? I'm sorry, Your Honor. Either waive the right to a jury trial, because these are defendants, actually. Waive the right to a jury trial. Let me decide this as a bench trial. So you have one person applying all this evidence, the six factors. All of a sudden, Rubik's Cube goes away, and you're left with something which works and which is manageable. Well, if that were to happen, of course, the result would be the same, and the court would not need to remand, because the district court, in the portion of their opinion on Rule 50B, said that no reasonable juror on the evidence presented. But he's wrong there, because we had jurors. Maybe the jurors weren't reasonable. Maybe the whole idea collapsed. But you had jurors on both trials that held for the plaintiffs. What I'm saying, Your Honor, is if the court were to convert it to a Rule 52 proceeding, then Judge Bailson, we can predict with confidence, based on Judge Bailson's Rule 50B discussion, that Judge Bailson would hold in a Rule 52 proceeding. The plaintiffs failed to meet their burden of proof. Given Judge Bailson's frustrations, what if we sent it to somebody else? Judge Bailson has committed no misconduct. There's no reason to think that he's – I don't think Judge Bailson would mind. He'd probably get down on his knees and thank us. It's fundamentally unfair to a civil defendant to have to endure repeat trials over and over and over again when the plaintiffs have not done this. What happens if you go back and there's another trial? But that's not the test for inherent authority. Inherent authority exists. I think it's well established that as a legal matter, there is inherent authority. That brings us to abuse of discretion. That Judge Bailson abuses discretion by saying, after supervising this for nine and a half years, I am convinced that nothing new could be done that would change the outcome. And if the answer is, well, just give him another chance. Give him a third trial. And the third trial is a hung jury. And we come back up here. Is that enough? That's the problem. The third trial, it seems to me, has to be conducted procedurally in a way that opens the door to a resolution. And giving 10 – I think it was a jury of 10 – giving 10 people a Chinese menu of 20 items to balance, that's never going to get to a resolution. Just to clear the record, it was eight jurors in both trials. And then with respect to that, the original question that was posed to the jury was a yes or no question. Did plaintiffs prove by preponderance of the evidence? And it was clear that any juror could get to the answer to that question their own way. So if one juror was persuaded about control, another was persuaded about whatever. But they all applied the same six-part test. They were all instructed as the well-established six-part test that feeds the economic realities factors and the slightly different but pretty similar 10-part test. And it's these plaintiffs. So you have eight jurors applying a six-part test to each of the plaintiffs. That's right.  And Judge Bilson admirably advised the jurors on those factors. The jurors came back with questions. They were answered. The judge at one point clarified some of the instructions. They did their best. And the jury just simply could not reach agreement. In the first trial, it was six to two vote for Uber. In the second trial, we don't know the actual split. But it wasn't unanimous. On the 50B issue, Judge Bilson was persuaded because in the second trial, there was much more focus on the fact that there were these PPA rules. That's right. And he took those out of the equation as going towards control. But the Department of Labor regulation says if they have been adopted by the company solely to comply with these regulations, then they can be discarded. Was there any evidence of the reason that Uber adopted the regulations that are within the PPA?  On appendix page 999, Jordan Holtzman-Constant testified that the Uber expectations aligned with PPA regulations because we needed to expect that drivers would comply with the law, things like no speeding, no driving while intoxicated, that sort of thing. So that's 999? Page 999. And then he also testified that there were some considerations around the certification that its subsidiary, co-defendant Gagin held could be jeopardized if there were legal violations by drivers. But I would actually legally suggest that the idea of the sole reason is actually not part of the standard for control. That was added to the regulation in 2024, actually after the first trial. It was never part of the regulation before. The case law on this issue, both the Parrish case and Moreau case from other circuits admittedly, indicate that if the requirement aligns with a law, that's not relevant to the control factor. The Department of Labor's 2021 regulation stated, and I'm quoting from the preamble, if a requirement applies equally to individuals who are in business for themselves and those who are employees, such as in the case of legal compliance, imposing the requirement is not probative. So that was actually the rule there as well. And, of course, under Loper-Bright, what the Department of Labor might say in a rule isn't binding on the court anyway. There's no case where that solely is. It's really no idea where that came from, from the rule, which, as we've indicated, the current Department of Labor has indicated an intent to rescind that rule anyway. But there is evidence on that point. There was no contradictory evidence. And really all of the examples, even some of the ones that Ms. Liz Riordan mentioned today, can be found in trial exhibits 401 and 402, which are the summaries of the PPA regulations that the parties admitted into evidence in the trial, suggest that they are just uber-ensuring that drivers are complying with the law, which, of course, can't be probative of the right to control. And all of the other considerations, as this court addressed in the Carpenter case just last year, are just expectations for general performance overall and really have nothing to do with control either in Carpenter or B. Pepperidge Farms, the court held, that every job, even those performed by independent contractors, have parameters and expectations. Of course, Judge Bailison's ruling was no reasonable juror could find for the plaintiff, and it wasn't just confined to that aspect. And we have two jurors in the first trial who did find for the plaintiff. So how can you make that conclusion? Well, certainly under Rule 50B, a court could enter judgment for the party that loses a unanimous verdict. So the fact that one or two jurors might have voted in favor of the plaintiffs is not probative on the question of whether a reasonable jury could find for the plaintiffs. This, again, none of the evidence that plaintiffs— No reasonable juror. No reasonable jury is this— Juror. He wrote juror. No reasonable juror, singular. He might have written that, but, I mean, the standard under Rule 50B is what it is. And I think if we look at the plaintiff's challenges to the six factors, none of them involved factual disputes. They involved plaintiffs' mischaracterization of the legal implications of that element, starting with control, obviously. The main one is that, as Judge Bailison correctly pointed out, most of the issues involved legal compliance. Those behind it involved the type of parameters and expectations dismissed by this court in the Pepperidge Farms case. If we think about things like opportunity for profit or loss, appellants don't dispute the facts that they had their own businesses, that they made a lot of money outside the Uber app. They argue legally that money they make outside the Uber app is irrelevant, but that's just simply not the case. That's a legal assessment of that element that Judge Bailison favored, independent contractor status. With regard to the investment factor, same thing. They misconstrued the factor as a legal matter as to whether it is limited. They assert that it's a dollar-for-dollar comparison between their transportation companies and Uber's technology business. But, of course, that's not what the investment factor considers. It considers whether the investments by the worker are entrepreneurial in nature in support of their business, which things like purchasing a vehicle, paying for insurance, and advertising are all, of course, pertinent as well. Similarly, the special skill factor, the judge found to be not that important, even recognizing that mere driving may not necessarily be a special skill. The judge appropriately pointed out that plaintiffs went to great lengths to talk about their experiences as black car drivers, the tests they had to take, the training they had to go through to obtain their commercial license to provide this higher-end service. But as the Department of Labor has written, in an economic realities test, we consider the totality of the worker's work. We don't isolate individual tasks. It's not just the mere act of driving. It's everything they did with respect to the promotion of their independent transportation businesses. And the degree of permanence factor, again, plaintiffs make a legal mistake. They say that... When you say promotion of their independent transportation businesses, you lost me there. I thought they were not allowed to advertise their own businesses while they're driving for Uber. The record, the trial record for both trials is absolutely undisputed that they were permitted to do whatever they wanted in terms of their independent businesses, and, in fact, that they did. The evidence demonstrated that they made significant sums of money by providing transportation outside the use of the Uber app. Mr. Razak testified that he and his brother formed a company that ended up acquiring 17 vehicles, leasing them out to other drivers, contracting with a company called BlackLane to get additional solicitations, and that he did all of that activity while he was online on the Uber app looking over to see if he might get a trip. Mr. Sabani testified and admitted at both trials that he had his own company and that he contracted with one of the other plaintiffs, Mr. Sherdood, to provide transportation to his clients that he gained through his own marketing and advertising efforts. And Mr. Sherdood admitted that while online on the Uber app, he would go solicit hotel doorman to refer hotel guests to take trips outside the Uber app. So the evidence on that point is undisputed. The contracts, which actually when we talk about right to control, the contracts themselves explicitly state that the plaintiffs, that drivers are free to provide transportation services outside the app. One thing they're not allowed to do is to do street hails. So maybe that's what plaintiffs are referring to, or that's maybe what you saw. Street hails are prohibited by PPA regulations. So that's an example where Uber's prohibition of street hails aligns with the law and can't be an indicator of control. With regard to degree of permanence, plaintiffs' argument that they drove with Uber for many years is only probed with the fact that they were apparently satisfied with their relationship with Uber over many years. But this court has held that that factor really turns on whether the alleged employee also took outside work. And here we know that they did that. We also know that Mr. Razak just turned off the app one day for a couple months and turned it back on when he wanted to drive again, and he was free to do that, not something an employee could very easily do. And so when we weigh all the factors, we see that Judge Belson was right, that no reasonable juror or jury could find in favor of the plaintiffs, and that all of the issues, all of plaintiffs' argument, have nothing to do with red light, green light, disputed issues of historical fact. Instead, they are misconstruing the legal standard, the lens through which these facts are viewed through the economic realities test. I do see that my time has expired. I have lots to say about the burden of proof in Pennsylvania issue, but I think I'll take your views on that, and thank you for your time. Thank you. Your Honors, there was an exhibit at trial that explained why Uber had these rules that clearly went above and beyond the PPA rules, and that was because Uber didn't want its drivers to make Uber look bad. A citation, Mr. Pritchard gave us the appendix for what he believes. Page 999 is Brendan's brain right there. My co-counsel will look it up. It was a trial exhibit. It wasn't just testimony. Mr. Pritchard makes an interesting point about the abuse of discretion standard. I mean, I was a district court judge. We all were trial judges. And you're there, you're seeing what's going on. You say, listen, I sat through two of these trials. It takes my time. I'm putting Uber through another trial. I'm going to exercise my discretion to deny you a third bite at the apple, basically. I mean, you're going to say he abused his discretion? Yes, because in an unprecedented way he did it for a reason that no court has done, which was his futility argument. But it's an unusual case. There aren't a lot of cases on all fours other than Wright. And in Wright, you could say that two panel members thought enough was enough. Well, Wright also, I mean, it said three. It said that you got three. Well, in a criminal case. In a civil case, maybe we say two is enough. Right, but again, wouldn't you think that criminal defendants should be afforded more leeway than a civil defendant? That doesn't really make sense. I think it's a question of the plaintiffs and the prosecution. I think the prosecution is afforded more leeway. Well, you also have Congress here, as well as the Pennsylvania legislature, who has set forth these rules that if you're talking about a separation of powers issue, legislatures have determined that these are important rights that actually need to be adjudicated. And remember that the first sentence of Judge Bailson's ruling that brought us here today is that this case has not been resolved. If this case has not been resolved, it means it still needs to be resolved. And Judge Bailson said he welcomes the input of the Third Circuit. He resolved it. What's that? He resolved it. Well, he says in the first line of his decision the case hasn't been resolved. He resolved it. He did. He wouldn't be here if he didn't. Okay. The look bad exhibit is at app 1239, the Uber Philly Quality Playbook. Bad drivers make good drivers look bad, and they make Uber look bad. And it goes through all of the rules, and it's to keep the drivers from making Uber look bad, which that goes beyond what the PPA requirements say. Now, the difference with this trial, Judge Bailson said, is there was more focus on the PPA rules. There wasn't any more factual focus on the PPA rules. It's just that Judge Bailson changed his mind about the law when we were at the jury instruction phase, after the evidence had been put on, and he flip-flopped from following Scantlin in the first case, saying that just because you have to follow regulations, Scantlin says that that means that the nature of your business requires that your workers be employees. In the second trial, he changed his mind. He didn't say the evidence was different. I think he said the focus of the argument, they argued much more strenuously that this is a distinguishing characteristic. Right, after we had put on the evidence. In the third trial, we may focus more on that now that we know that the court flip-flopped on it, and also after we hear what this court has to say about it. Is Scantlin correct? Is that DOL reg correct? Which, of course, cited to one district court case from New York. This court can decide to rely on other case law, particularly circuit law, rather than a DOL regulation or a district court decision. I mean, essentially, we're at the same place we were the last time this court heard this case, which was that the prior ruling was the district court said, as a matter of law, the plaintiffs can't get a trial. And now the district court, once again, is saying the plaintiffs don't get a trial. But the issue hasn't actually been resolved. On the right to terminate at will, you asked me before what my best cases are, that the right to terminate at will is a strong indicator of control. This court's decision in Drexel v. Union Prescription Centers, 582 F. 2nd, 781 at 789. Read that again, please. Yes, Drexel v. Union Prescription Centers, 582 F. 2nd, 781. There's also the U.S. Supreme Court decision in Goldberg, which held that knitters who worked at home whenever they wanted, wherever they wanted, were employees. 366 U.S. at 32 to 33. That's a lot like Dallas, America, though. And those cases seem to be so qualitatively different than what we have here. Uber has built its entire business model on this idea that because the workers can work whenever they want, and wherever they want, that makes them independent contractors. But I'm just bringing us back to the fact that the U.S. Supreme Court in Goldberg said that knitters who worked from home whenever they wanted, and wherever they wanted, were employees. This court in Dial America said that researchers who worked from home whenever they wanted, wherever they wanted, were employees. And the Pennsylvania Supreme Court in Lowman held that Uber had control over a driver on facts that were essentially the same as the facts in this record. So again, on the Rule 50 analysis, another reason I was trying to bring that up before, is that that also shows that Judge Bailson erred in finding that these facts show that they're independent contractors. The Pennsylvania Supreme Court found them to be employees under an AEC test, and prong A is essentially the control prong that applies under the economic realities test. One question that you were asking Uber's counsel was, what factors should the court consider in determining whether to allow another trial or instead dismiss the case based on futility? I would submit, plaintiffs would submit, that one factor is the public importance of the question. This is a question that has dogged Uber for its entire existence, more than a decade. This is the first case in the country that went to trial on the question of whether Uber drivers are employees or independent contractors. Throughout the country, throughout the last decade and a half since it has been in existence, Uber has ducked that question by preventing these cases from going to trial. This is a historic case. The cases have settled. No, the cases have been compelled to arbitration so that there have never been court rulings. That's what's happened. So that's why this is a case of extreme public importance to get a question. And in fact, Judge Baleson said that Uber wants to answer to this question to determine how it's going to be able to continue to operate. It has avoided ever getting a ruling on its behavior. This is a very important question. And to allow the district arbitration provisions in these these drivers opted out of arbitration, which is why they're before court. And that's easy. We say they opted out. There's no I know this is not before us. There's no arbitration clause in any of the agreements for these plaintiffs. In other words, they were given the opportunity to opt out of arbitration and very early. Judge Baleson agreed that they had opted out of arbitration and their cases could proceed in court.